Edward E. Yates, Esq.  SB#135138
Law Office of Edward E. Yates
2060 Sutter Street, #403
San Francisco, CA 94115
Telephone:  (415) 990-4805
Email:  eyates@marinlandlaw.com

Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRIEN AG SOLUTIONS, INC., a California corporation; and DOES 1-10, inclusive,<br><br>Defendant. | Case No.:  2−23−CV−00943−KJM−CKD<br><br>**STIPULATION TO DISMISS ENTIRE ACTION AGAINST ALL DEFENDANTS WITH PREJUDICE; [PROPOSED] ORDER GRANTING DISMISSAL WITH PREJUDICE**<br><br>**FRCP 41(a)(2)** |

    Plaintiff Central Valley Eden Environmental Defenders, LLC ("Plaintiff") and Defendant

Nutrien AG Solutions, Inc. ("Defendant"), hereby enter into this Stipulation to Dismiss

Plaintiff's Complaint and all claims against all Defendants with prejudice.

WHEREAS, Plaintiff and Defendant (the "Parties") have entered into a settlement agreement that achieves a full and final settlement of all Plaintiff's claims against Defendant as set forth in the Complaint filed in this matter on May 19, 2023 (Docket No. 1).

WHEREAS, on October 12, 2023, the Parties filed a Notice of Settlement notifying the Court that the Parties had reached a full settlement to resolve all outstanding issues in this action ("Settlement Agreement").

WHEREAS, on October 18, 2023, Plaintiff served a copy of the Settlement Agreement on the Department of Justice ("DOJ") for a mandatory 45-day review period under 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.5.  All interested parties agree that the expiration date of the 45-day review period was December 4, 2023.

WHEREAS, the Parties' Notice of Settlement specified that upon the expiration of the DOJ's review period, if no objection was lodged by the DOJ, the Settling Parties would stipulate to and request an order from this Court dismissing with prejudice Plaintiff's claims as to Defendant.

WHEREAS, the statutory agency review period has expired without any objection being lodged by the DOJ.

NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to by and between the Parties that Plaintiff's Complaint and all claims against Defendant shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).

The Parties respectfully request an order from this Court dismissing such claims with prejudice, with each side to bear their own attorney fees and costs, except as provided for by the terms of the Settlement Agreement attached hereto as **Exhibit A**.

.

1  Dated: December 11, 2023                    Respectfully,

2

3                                              By: ___/S/ Edward E. Yates_____

4                                                  Edward E. Yates
                                                   Attorney for Plaintiff
5

6

7

8  Dated: December 11, 2023                    Respectfully,

9

10                                             By: __Tiffany R. Hedgpeth_____

11                                                 Tiffany R. Hedgpeth
                                                   Attorney for Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Good cause appearing, and the parties having stipulated and agreed, IT IS HEREBY ORDERED as follows:

The Complaint filed in this matter by Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, and all claims against Defendant NUTRIEN AG SOLUTIONS, INC. are hereby dismissed in their entirety, with prejudice.

Each party is to bear their own attorney fees and costs, except as provided for in the Settlement Agreement executed by the Parties on October 18, 2023, a copy of which is attached hereto as **Exhibit A** and incorporated herein by reference.

PURSUANT TO STIPULATION, IT IS SO ORDERED.


Dated: _____, 2023

By: _____
     Honorable Kimberly J. Mueller
     UNITED STATES DISTRICT JUDGE

# EXHIBIT A

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is entered into by and between Central Valley Eden Environmental Defenders, LLC ("EDEN"), on behalf of itself and its members, and Nutrien Ag Solutions, Inc. ("Nutrien Ag Solutions").  EDEN and Nutrien Ag Solutions are hereinafter each referred to as a "Party" or collectively as the "Parties."

## RECITALS

A.   WHEREAS, EDEN is an environmental citizen's group organized under the laws of the State of California, dedicated to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands, vernal pools, and tributaries of California, and the United States.

B.   WHEREAS, Nutrien Ag Solutions operates a facility that distributes and/or mixes fertilizers, pesticides and fungicides.  The facility is located at 1905 North Broadway Avenue in Stockton, California ("Facility").

C.   WHEREAS, EDEN contends the Facility is subject to various federal and state regulatory requirements, including compliance with the Federal Clean Water Act ("CWA") through the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001) [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ, as amended by Orders 2015-0122-DWQ and 2018-XXXX-DWQ (hereinafter "General Permit").  The Facility is currently not covered under the General Permit.

D.   WHEREAS, on August 4, 2022, EDEN served Nutrien Ag Solutions with a 60-Day Notice of Violations and Intent to File Suit ("Notice Letter") alleging various violations of the CWA and the General Permit relating to activities at the Facility.  A copy of the Notice Letter is attached hereto as **Exhibit A**.

E.   WHEREAS, on or about May 19, 2023, EDEN filed a Complaint in U.S. District Court for the Eastern District of California against Defendant Nutrien Ag Solutions (Civil Action No. 2:23−CV−00943−KJM-CKD) ("Complaint").

F.   WHEREAS, Nutrien Ag Solutions denies all allegations and claims contained in the Complaint and Notice Letter and reserves all rights and defenses with respect to such allegations and claims.

G.   WHEREAS, the Parties have expended effort and resources in investigating and evaluating the allegations and claims set forth in the Notice Letter and Complaint, as well as engaging in negotiations regarding settlement.

H.   WHEREAS, the Parties believe it is in their mutual interest to now resolve in full through settlement EDEN's allegations set forth in the Notice Letter and Complaint, to avoid the cost and uncertainties of further litigation.

NOW, THEREFORE, for good and valuable consideration through the execution of this Agreement and the releases, satisfactions and promises made herein, the Parties hereby agree as follows:

## TERMS AND CONDITIONS

1. **Parties Bound By This Agreement**. This Agreement, and each of its provisions, including all representations, warranties, and promises contained herein, binds, and inures to the benefit of EDEN and Nutrien Ag Solutions and each of their respective assigns, present and future operators, affiliates, parents, subsidiaries, predecessors, and successors in interest whether by merger, consolidation, or amalgamation, as well as their respective representatives, agents, members, officers, and administrators, past, present, and future.

2. **Effective Date**. The "Effective Date" of this Agreement is the last day for the U.S. Department of Justice to provide comment, i.e., the 45th day following the U.S. Department of Justice's receipt of the Agreement.

3. **Term**.  The "Termination Date" shall be three (3) years from the Effective Date, at which time the Agreement, and all obligations under it, shall automatically terminate.

4. **Actions Required by EDEN:**

   A.   Within three (3) business days of receiving all the Parties' signatures to this Agreement, EDEN shall submit this Agreement to the U.S. Department of Justice ("DOJ") and EPA for agency review consistent with 40 C.F.R. § 135.5.  The agency review period expires forty-five (45) days after receipt by the DOJ, evidenced by correspondence from DOJ establishing the review period.

   B.   Within three (3) days of the mutual execution of this Agreement, EDEN shall submit a Notice of Settlement to the Northern District Court.

   C.   Within seven (7) days of the expiration of the 45-day agency review period described above, the Parties shall execute a joint Stipulation for Dismissal, and EDEN shall submit same to the Court with a proposed Order.

   D.   The Stipulation for Dismissal shall provide that the Complaint and all claims against Defendant shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and that the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement, which shall be attached thereto and fully incorporated by reference, through the Termination Date. Nothing in this Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from a motion to enforce the terms of this Agreement.

5. **Actions Required By Nutrien Ag Solutions**.  In exchange for the delivery, execution, and performance of this Agreement and of the releases by EDEN as provided herein, Nutrien Ag Solutions shall perform the below-specified mitigation activities with respect to the Facility, within the term of this Agreement.  Nutrien Ag Solutions shall have the right, in its sole discretion, to determine (i) which persons shall perform any work described herein, including Nutrien Ag Solutions' employees or third-party contractors or consultants; and (ii) the scope and technical details of, and manner to implement, any such work.

**SPECIFIC MITIGATION ACTIONS TO BE TAKEN BY NUTRIEN AG SOLUTIONS**

5.1 *Application for Coverage under the General Permit*

Within sixty (60) calendar days of the Effective Date, Nutrien Ag Solutions shall complete the following tasks to obtain coverage under the General Permit:

(a)  Navigate to the California State Water Resources Control Board SMARTS website located at California Storm water Multiple Applications and Report Tracking System;

(b)  Create a SMARTS Account;

(c)  Complete all required data in SMARTS to apply for standard Notice of Intent General Permit coverage and pay the required fees; and

(d)  Upload all required Permit Registration Documents, including a SWPPP and Site Map compliant with Section 5.4 herein.

5.2 *Storm Water Monitoring, Sample Collection and Analysis*

A.  *Storm Water Sample Collection and Analysis*

1.  Nutrien Ag Solutions shall collect and analyze storm water samples from the Facility, from the Effective Date to the Termination Date, from Qualifying Storm Events ("QSEs"), at the times and frequencies required by the General Permit; specifically, two (2) samples in the first half of each reporting year (July 1-December 31) and two (2) in the second half of each reporting year (January 1-June 30).

2.  "QSE", as defined herein is any rain event that  is preceded by 48 hours with no discharge from any drainage area and which produces a measurable and collectible discharge at any of the Facility's industrial discharge locations

("Sampling Locations") identified in Nutrien Ag Solutions' SWPPP and Facility Map.

3.    Nutrien Ag Solutions shall ensure that the collection, preservation, and handling of these storm water samples are in accordance with *General Permit Attachment H, Storm Water Sample Collection and Handling Instructions* and its SWPPP.

4.    Samples are to be collected from all Sampling Locations identified in Nutrien Ag Solutions' SWPPP and Facility Map where a discharge occurs.  The Sampling Locations must be representative of storm water associated with industrial activities and any commingled authorized NSWDs; or associated with any discharge of contained storm water.

5.    Nutrien Ag Solutions may, in its sole discretion, modify the Sampling Locations in accordance with its SWPPP, and such modification(s) shall not be a breach of this Agreement.

6.    Stormwater samples from each Sampling Location shall be collected within four (4) hours of:

    a)    The start of the discharge (including discharge of collected and treated storm water); or

    b)    The start of facility operations if the QSE occurs within the previous 12-hour period (e.g., for storms with discharges that begin during the night for facilities with day-time operating hours). Sample collection is required during scheduled facility operating hours and when sampling conditions are safe pursuant to Section XI.C.6.a.ii. of the General Permit.

7.    All stormwater samples collected from the Facility are to be analyzed for the following parameters: Total Suspended Solids (TSS), Oil and Grease (O&G) and pH; Iron, Nitrate+Nitrite (N+N), Lead, Zinc and Phosphorus.

8.    Further, Nutrien Ag Solutions shall analyze its stormwater samples for any additional sampling parameter identified in its SWPPP's Pollutant Source Assessment, pursuant to Sections X.F, X.G and XI.B.6.c of the General Permit as well as any additional parameters required by the Water Board or the General Permit.

9.    Samples are to be forwarded within forty-eight (48) hours of collection to a California ELAP-certified analytical laboratory selected by Nutrien Ag Solutions in its sole discretion.

10. Nutrien Ag Solutions shall upload to the State Water Resources Control Board Stormwater Multiple Application and Report Tracking System ("SMARTS") all sample analyses received from its analytical laboratory, within thirty (30) days of receipt of the sampling data.

### 5.3 *Mitigation of Potential Exceedances*

(a)  In the event that the sample analyses of Nutrien Ag Solutions' storm water samples collected pursuant to Section 5.2 above, indicate results for the tested parameters that exceed either the instantaneous or annual Numeric Action Levels ("NAL") levels listed in Table 2 of the General Permit attached hereto as **Exhibit B**, Nutrien Ag Solutions agrees to work with its designated Qualified Industrial Storm Water Practitioner ("QISP"), as that term is defined by the General Permit, or other environmental professional to review Nutrien Ag Solutions' housekeeping practices and Best Management Practices ("BMPs"), and if necessary revise its SWPPP in order to reduce its analyzed pollutant parameters, and to provide training and consultation to achieve that objective, and to follow the provisions set forth in Section XII of the General Permit related to required Exceedance Response Actions, if required.

(b)  In the event that Nutrien Ag Solutions' storm water samples indicate sampling parameter not specified in Table 2 of the General Permit exceed receiving water limitations as described in Section VI of the General Permit, Nutrien Ag Solutions shall comply with the Water Quality Based Corrective Actions set forth in Section XX.B of the General Permit, including the preparation of a Water Quality Based Corrective Action Report.

### 5.4 *Best Management Practices*

Nutrien Ag Solutions shall develop and implement technologically and economically achievable BMPs necessary to prevent and/or reduce contamination in its stormwater discharges, consistent with use of BAT and BCT, as required by the General Permit.

In addition to those minimum and advanced BMPs specified in its current SWPPP, Nutrien Ag Solutions agrees to implement and maintain the following BMPs at the Facility:

(a) Sweeping:  Loading and unloading of dry fertilizer, if any, shall be performed over a load pad.  Spilled fertilizer shall be cleaned up daily via sweeping, use of sump pumps, or manual washing. Any water generated shall be contained and properly reused or disposed of offsite.

(b) Vehicle Maintenance:  Conduct all vehicle maintenance within a contained area and in accordance with written standard operating procedures.

(c)  <u>Vehicle Fueling</u>:  Conduct outdoor vehicle fueling in accordance with written standard operating and incident procedures and in compliance with all local, state or federal laws or ordinances.

(d)  <u>Vehicle Storage</u>:  Facility vehicles shall be regularly maintained. .Any grease/oil leaks/product leaks or stains caused by vehicles shall be cleaned up upon discovery.

(e)  <u>Outdoor Storage of Materials, Scrap and Equipment</u>:  Within sixty (60) days of the Effective Date of this Agreement, complete an evaluation of all outdoor storage of industrial materials, miscellaneous equipment, tools, scrap metals, parts, and all other materials stored outdoors.  To the extent that any of the foregoing is obsolete, no longer utilized in Facility operations, trashed, discarded as waste, or otherwise extraneous or unnecessary, Nutrien Ag Solutions shall dispose of same in a lawful and timely manner.

(f)  <u>Trash and Debris:</u> Cover or close all waste receptacles when not in use and prior to rain events; and dispose of on-Facility trash and debris properly and in a timely manner.

(g)  <u>Secondary Containment</u>:  Except for what may be stored in vehicles, store all petroleum-based materials and petroleum-based wastes and all chemicals which have the potential to come into contact with rainfall or stormwater runoff indoors, or within secondary containment having a volume of at least 110 percent of the contents of the largest vessel stored within the containment.

(h)  <u>Dust Minimization</u> Utilize appropriate dust minimization BMPs during windy conditions.

5.5  ***Storm Water Pollution Prevention Plan***

Within thirty (30) days of the Effective Date of this Agreement, Nutrien Ag Solutions shall engage a professional Environmental Consultant or QISP to prepare a Storm Water Pollution Prevention Plan (SWPPP) and Facility Map to comport with the requirements set forth in Section X of the General Permit.

The SWPPP and Site Map revisions shall include the results of the Technical Report referenced in Section 5.1.A herein and shall be finalized and uploaded to SMARTS within sixty (60) days of the Effective Date.

A.   Nutrien Ag Solutions shall prepare a SWPPP which includes the following, and shall upload to SMARTS within thirty (30) days a revised SWPPP whenever any of the following has been modified or is no longer accurate:

1. Complete <u>Facility information</u>, including location (street address), the current Facility operator and the current legal name of the business entity owner/operator; Facility WDID number (IGP Sections II.A, II.C, X.A.1, XXI.K, XXI.R);

2. Current scheduled <u>Facility operating hours</u>, including temporary, intermittent, seasonal and weather dependent hours, if applicable (IGP Section X.D.2.d);

3. If the Facility plans to temporarily suspend industrial activities for ten (10) or more consecutive calendar days during the term of this Agreement, Nutrien Ag Solutions shall include in the SWPPP a statement of <u>Temporary Suspension of Industrial Activities</u>, along with the approximate dates of suspension, and shall also include a list of all BMPs necessary to achieve compliance with the General Permit during the period of suspension (IGP Section X.H.3);

4. The name and title of the Facility's current <u>Legally Responsible Person</u> (LRP), and a certification page signed by the Facility's current LRP. The certification page shall include a statement that the LRP is eligible to be the Facility's LRP, pursuant to Section XXI.K of the General Permit (IGP Sections II.A, II.B, XXI.K, XXI.L);

5. Detailed information regarding the Facility's <u>Pollution Prevention Team</u> members, to include the names and titles of all members; and the responsibilities, duties and activities of each of the team members, including the names of team members assigned to conduct monitoring requirements. The Facility's Pollution Prevention Team must include at least one team member who is present at the Facility on a full-time basis and may not be comprised solely of third-party environmental consultants or regional environmental managers/compliance officers (IGP Sections X.D.1, X.I.1);

6. The date that the SWPPP was initially prepared and the date of each SWPPP Amendment, to be set forth in an updated <u>Amendment Log.</u> The Amendment Log shall include exact dates (rather than just a month and year), and the SWPPP shall accurately represent the date of its preparation and implementation, which should closely correspond with the date the SWPPP is certified and submitted to SMARTS (IGP Sections II.D.1.a, X.A.10, X.B);

7. If any part of an <u>existing plan</u>, procedure or regulatory compliance document relating to General Permit requirements is incorporated in the SWPPP (such as a Hazardous Materials Business Plan), the original source shall be properly referenced (IGP Section X.D.2);

8. A detailed discussion of all <u>Facility operations and industrial processes</u>, including manufacturing, cleaning, maintenance, recycling, disposal and any other activities related to all industrial processes; material handling activities (storage, loading

and unloading, transportation or conveyance of any industrial raw material, intermediate product, final product or waste product), dust and particulate generating activities; and processing of waste or by-products.  The Facility's SIC Code should be included (IGP Sections X.G.1 and XVII.B);

9. A detailed <u>assessment of all potential pollutants</u> present at the Facility, taking into account the complete list of industrial materials and chemicals stored, handled or utilized onsite as specified above; as well as the locations where the potential pollutants are stored, handled or utilized, and specifically identifying any industrial materials and chemicals present at the facility which may have the potential to come into contact with storm water (IGP Sections X.F and X.G);

10. A detailed discussion of all Facility <u>receiving waters</u>, and the Facility's specific connection (i.e. direct or indirect) to the receiving waters, including tributaries and water pathways; the proximity of the receiving waters and the manner of discharge to the receiving waters (e.g. through surface flow, underground storm water connection, City MS4 storm drain system), and whether any receiving water 303(d) listed impairment or receiving water limitation/TMDL is present at the Facility (IGP Sections VI, X.G.2.a.ix, XI.B.6.e, Attachments D, E);

11. A detailed discussion of Facility <u>drainage and all discharge locations</u>, including total Facility size in square feet or acres and total area of industrial operations; drainage information for each separate drainage area, including industrial operations in the drainage area, direction of storm water flow, quality/perviousness of ground surfaces, existence of drainage/retention basins and bioswales, and grading; potential off-site discharge from the Facility's entrances and exits, and an evaluation of all drains (inlets and outlets), identifying connections to storm water conveyance systems (IGP Section X.G.1.e.iii, .X.I, XI.B.4, Attachment H);

12. A detailed description of all <u>sampling locations</u>, including a discussion of how the sampling locations are representative of industrial operations, the location and type of all sampling points (inserting a photograph of the sampling location if appropriate), and an identification of any Alternative Discharge Locations (IGP Sections X.E, X.I, XI.B.4.a, XI.C.3.b, Attachment H);

13. A detailed discussion of <u>sampling protocols, frequencies and methods</u>, including a discussion of how samples are to be collected, proper test methods and pH holding time limitations, Representative Sampling Reduction justification (if applicable), Qualified Combined Sample justification (if applicable) and Sampling Frequency Reduction certification, if the Facility qualifies for the reduction.  (IGP Sections X.I, XI.B, XI.C, Table 2, Attachment H);

14. For all advanced <u>Storm Water Containment and Discharge Reduction BMPs</u> such as sediment basins, retention or detention basins or ponds; or treatment systems, currently implemented or modified/redesigned,  a complete, accurate and detailed description, including information from the Technical Reports specified <u>in Section 3.1.A</u> herein, a photograph of the containment system; description (including whether the system is lined or valved); specific information relating to procedures for intentional discharge, including the requirement to maintain a discharge log and to collect stormwater samples prior to discharge; details on where the discharge drains; the date of installation or most recent modification; its capacity in number of gallons, Design Storm Standards to comport with Section X.H.6 of the General Permit, specific information related to the amount of rainfall likely to produce a discharge; and instructions regarding monitoring weather forecasts to prepare for sampling in the event of an unintentional discharge.  (IGP Section X.H.1.e.v, X.H.2.b.ii, X.H.6);

15. An example Chain of Custody form which includes a section to record pH values, date and time of sampling, pH test type, and the results of the test (IGP Sections X.I.5; XI.C)

16. All mandatory <u>sampling parameters</u>, including total suspended solids, oil & grease, and pH; all additional sampling parameters required for the Facility's SIC Code, all additional sampling parameters associated with the Facility's potential pollutant assessment; any additional sampling parameters related to the Facility's receiving water impairments associated with industrial materials present at the facility; any additional parameters requested by the Water Board (IGP Sections X.F, X.G.2.d and XI.B.6, Attachment H);

17. A discussion of required monthly and sampling <u>visual observations</u> (IGP Sections X.I.2, XI.A);

18. A discussion of <u>Exceedance Response Action</u> requirements (IGP Section XII);

19. An evaluation of the areas of the Facility where <u>spills and leaks</u> are likely to occur (IGP Section X.G.1.d.i);

20. A list of any significant quantities of industrial materials, or any toxic or hazardous chemical that has <u>spilled or leaked</u> at the Facility and which has either discharged from the facility's perimeter or had the potential to discharge, within the <u>previous five (5) year period</u>, including a discussion of the location, characteristics, and approximate quantity of the materials spilled or leaked; approximate quantity of the materials discharged; cleanup or remedial actions that have occurred or are planned; and preventive measures to ensure spills or leaks do not reoccur (IGP Section X.G.1.d.ii);

21. A discussion of all <u>non-storm water discharges (NSWDs)</u> at the Facility, including the source, quantity, frequency and characteristics of all NSWDs, and their associated drainage area. The SWPPP must include a discussion of how all unauthorized NSWDs (such as vehicle, equipment and industrial material washing and piped cooling tower blowdown) have been eliminated or covered under a separate permit. For authorized NSWDs (including landscape watering, drinking fountain water or air conditioning/compressor condensate, and incidental windblown mist from cooling towers), the SWPPP must include specific BMPs designed to reduce or prevent the NSWD from contacting potential pollutant sources and ensuring that the NSWD does not contribute to an exceedance of a water quality standard (IGP Sections I.C.26, IV and X.G.1.e);

22. A discussion of any <u>additional separate individual or general NPDES</u>, combined sewer system or waste discharge permits held by the Facility (IGP Section I.A, I.B);

23. A description of any facility location where <u>soil erosion</u> may be caused by industrial activity, NSWDs or run-on from areas surrounding the facility (IGP Section X.G.1.f);

24. A discussion of the approximate percentage of <u>imperviousness</u> of Facility surfaces (IGP Section X.E.d);

25. A discussion of all required <u>minimum BMPs</u> the Facility is currently implementing, including the categories of Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Recordkeeping (IGP Sections I.D, X.H.1);

26. A discussion of the BMPs the Facility will implement to prevent <u>rinse/wash waters</u>, cooling tower piped blowdown or other industrial materials from entering the storm water conveyance system and to ensure that all facility areas impacted by rinse/wash waters or cooling tower discharges are cleaned as soon as possible (Section X.H.1.a);

27. All <u>additional BMPs</u> specified in Section 5.3, above;

28. A <u>BMP Summary Table</u> summarizing each BMP currently being implemented at the Facility; the associated industrial pollutant the BMP is designed to reduce or prevent; the frequency, times of day or conditions when the BMP is scheduled for implementation; the locations within each area of industrial activity where the BMP is to be implemented; and the frequencies of implementation (IGP Sections X.H.4 and X.H.5);

29. A discussion of the requirement for an <u>Annual Comprehensive Facility Compliance Evaluation</u> (IGP Section XV); and

30. A discussion of the requirement for the Facility to file an <u>Annual Report</u> no later than July 15th of each reporting year (IGP Section XVI);

B. Nutrien Ag Solutions shall revise its Site Map to depict and/or include the following:

1. Notes, legends, a north arrow and other data to ensure the Site Map is clear, legible and understandable, including a satellite photograph or Google Earth image of the Facility (IGP Section X.E.1);

2. Clearly defined Facility boundary and all Facility entrances/exits (IGP Section X.E.3.a);

3. All areas of industrial operation, including industrial storage areas, storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, material and scrap storage areas ("boneyards"), waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, cooling towers, and all other areas of industrial activity that may have potential pollutant sources; identification of any alleged non-industrial areas within the Facility boundary (IGP Section X.E.f);

4. Locations where materials are directly exposed to precipitation (IGP Section X.E.3.e);

5. Identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas or other roofed structures (IGP Section X.E.d);

6. Complete and accurate direction of onsite storm water flow in all drainage areas, including surface flow offsite through Facility entrances/exits (IGP Section X.E.3);

7. All storm water drainage areas within the Facility boundary, as well as portions of any drainage area impacted by discharges from surrounding areas (IGP Section X.E.3.a);

8. Storm water collection and conveyance systems (including depiction of underground piping and conveyance system connections) and associated discharge locations; and locations and descriptions of structural control measures (including all onsite drain inlets, catch basins, berms, detention ponds, secondary

containment systems, oil/water separators and diversion barriers) that affect storm water discharges and/or run-on (IGP Section X.E.3);

9.  Municipal storm drain inlets which receive the Facility's industrial storm water discharges and authorized non-storm water discharges (IGP Section X.E.3.a);

10. Sampling locations representative of industrial operations (IGP Section X.E.3.b);

11. Locations where identified significant spills or leaks have occurred (IGP Sections X.E.e and X.G.1.d);

12. All areas of soil erosion (IGP Section X.E.3.a); and

13. On-site surface water bodies and/or locations of nearby water bodies, such as rivers, lakes, wetlands, etc. (IGP Section X.E.3.a).

## 5.6  *Further Compliance with the General Permit*

For the duration of this Agreement, Nutrien Ag Solutions agrees to comply with all standard conditions of the General Permit, specifically with respect to the following:

(a) Conducting Monthly and Sampling Visual Observations and maintaining evidence of the observations in the form of written reports;

(b) Uploading to SMARTS a complete and accurate Annual Report for the reporting periods covered under this Agreement by July 15th of each Reporting Year;

(c) Maintaining a current and adequate SWPPP by uploading it to SMARTS and retaining a copy onsite;

(d) Complying with all applicable Exceedance Response Action requirements specified in Section XII of the General Permit;

(e) Conducting all required Annual Comprehensive Facility Evaluations; and

(f) Complying in a timely manner with any future orders or directives of the Regional Water Board regarding compliance with the General Permit.

## 5.7  *Submission of Additional Reports to EDEN*

For the duration of this Agreement, to the extent that any report, document or communication submitted to or received by the Regional Water Board related to compliance with the General Permit is not uploaded to SMARTS, Nutrien Ag Solutions

agrees to provide EDEN with a copy of same, in a digital (PDF) format, within five (5) business days of request by EDEN.  .

5.8   _Site Visit_

Prior to the Termination Date, EDEN may conduct a maximum of three (3) Site Visits to review Nutrien Ag Solutions' compliance with the General Permit.  EDEN shall provide Nutrien Ag Solutions with a minimum of fourteen (14) days' advance notice of each such visit in accordance with the notice requirements of this Agreement and shall set the Facility visit at a time during business hours convenient to Nutrien Ag Solutions and its counsel. EDEN and any of its representatives performing a Site Visit shall provide and wear Class-2 rated safety glasses, helmets, vest, and appropriate footwear (closed and steel toed).

5.9   _Employee Training_

Within ninety (90) days of the Effective Date, Nutrien Ag Solutions shall develop and implement an employee training program for employees responsible for implementing the SWPPP (including the Monitoring Implementation Plan).  The training program shall cover, at a minimum, the following:  BMP implementation, Stormwater Collection and Sampling Protocols, Visual Observations, Non-Stormwater Discharges, and Recordkeeping.

Furthermore, Nutrien Ag Solutions will conduct annual training thereafter, for the term of this Agreement, for its storm water personnel on storm water monitoring and reporting, BMPs, the General Permit, and General Permit compliance. Nutrien Ag Solutions will document such training and provide documentation of the training to EDEN upon request.

6.   **Reimbursement of Fees and Costs**.  Nutrien Ag Solutions shall reimburse EDEN in the amount of Forty-Six Thousand Two Hundred Seventy-Nine Dollars ($46,279.00) to cover EDEN's investigation, expert and attorney fees and costs, as well as all other reasonable costs associated with investigating and negotiating a resolution of this action.

Within thirty (30) calendar days of the Effective Date, Nutrien Ag Solutions shall tender payment in the form of a certified or cashier's check made payable to "Adam Brumm Attorney Trust Fund" sent by overnight mail with tracking to the address listed below.  Alternatively, payment may be made by ACH or wire transfer.

Adam Brumm
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616

Telephone: (800) 545-7215, extension 906
Email:  adam@edendefenders.org

7. **Environmental Mitigation Payment.**  Nutrien Ag Solutions agrees to pay the sum of One Thousand Dollars ($1,000.00) to Friends of the River for the sole purpose of providing environmentally beneficial projects within the Central Valley Region to improve water quality in those communities.   No funds from the Environmental Mitigation Payment will be directed to or utilized by EDEN, and no funds from such payment shall be used to fund administrative challenges or judicial litigation. Further, Friends of the River shall not use any of the funds for political purposes.

Such mitigation payment shall be remitted within ten (10) calendar days of the Effective Date of this Agreement, directly to Friends of the River at:

> Jann Dorman
> Friends of the River
> 3336 Bradshaw Rd., Suite 335
> Sacramento, CA  95827
> Telephone:  (925) 518-0320
> Email:  janndorman@friendsoftheriver.org

8. **Compliance Monitoring Funding.** To defray EDEN's reasonable research, investigative, expert, legal and consultant costs associated with monitoring Nutrien Ag Solutions' compliance with this Agreement, Nutrien Ag Solutions agrees to contribute Four Thousand Dollars ($4,000.00), for each of the annual Reporting Periods covered by this Agreement, to a compliance monitoring fund maintained by EDEN.

All annual compliance monitoring funding checks shall be made payable to "AQUA Stormwater Compliance" and forwarded to the following address:

> Theo Mills
> AQUA Stormwater Compliance
> 1296 E. Gibson Road #A-125
> Woodland, CA  95776
>
> Telephone: (530) 302-5293
> Email:  aqua.swcompliance@gmail.com

Payment of the first annual compliance monitoring fee is due within five (5) calendar days of the Effective Date of this Agreement.  Payment of the second annual compliance monitoring fee shall be made on or before September 1, 2024; and payment of the third annual compliance monitoring fee shall be made on or before September 1, 2025.

The parties hereto agree that the aforementioned provision for payment of additional compliance monitoring fees upon material violation of Section 5 provisions does not constitute

liquidated damages upon payment; and further, is not contemplated to preclude EDEN from
filing a breach of contract suit in state court to compel Nutrien Ag Solutions' specific
performance with <u>Section 5</u> provisions.

9. **Breach of Payment.**  If any payment owed under this Agreement is not remitted or post-
marked on or before its due date, EDEN shall provide written notice to Nutrien Ag Solutions
in accordance with <u>Section 144</u> herein. If Nutrien Ag Solutions fails to pay within three (3)
business days of such notice, then all future payments due hereunder shall become
immediately due and payable.  Nutrien Ag Solutions shall pay interest on any payments due
under this Agreement that are not received by EDEN by the due date.  The interest shall accrue
starting the first day after the payment is due and shall be computed at 10% per year.

10. **Mutual Waiver and Release**.  EDEN, on its own behalf and on behalf of its officers, directors,
contractors, associational members, board members, affiliates and each of their successors and
assigns, releases Nutrien Ag Solutions, its officers, directors, employees, members, parents,
subsidiaries, affiliates, successors or assigns, agents, attorneys and other representatives
(including specifically Defendant &individual) from and waives all claims raised in the 60-
Day Notices and/or the Complaint and any claims for acts or omissions through the
Effective Date of this Agreement, including all claims for fees (including fees of attorneys,
experts, and others), costs, expenses, or any other sum incurred or claimed or which could
have been claimed for matters included in the 60-Day Notices and/or the Complaint,
exclusive of the provision for payment of fees and costs in <u>Section 6</u>, above.

Nutrien Ag Solutions, on its own behalf and on behalf of its officers, directors, employees,
members, parents, subsidiaries, affiliates, or their successors or assigns release EDEN and
its officers, directors, contractors, associational and board members, and its affiliates, and
each of their successors and assigns from, and waives all claims which arise from or pertain
to, the 60-Day Notice and/or the Complaint, including all claims for fees (including fees of
attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or
which could have been claimed for matters included in the 60-Day Notices and/or the
Complaint.

11. **No Admission**.  This Agreement is the direct result of a compromise of disputed allegations
and claims.  As such, this Agreement shall not, for any purpose, be considered as an admission
of liability or of any violation of the General Permit, the Clean Water Act or applicable
California law by Nutrien Ag Solutions or any other party, nor shall the payment of any sum of
money in consideration for the execution of this Agreement constitute or be construed as an
admission of liability or of any violation of the General Permit, the Clean Water Act or
applicable California law by Nutrien Ag Solutions or any other party.

12. **Force Majeure**.  None of the Parties shall be deemed in default or breach of this Agreement by
reason of any event that constitutes a force majeure.  For purposes of this Agreement, a force
majeure is defined as any event arising from causes beyond the reasonable control of the
Parties or their contractors that delay or prevent performance.  This includes, without limitation,
acts of God, acts of war, earthquake, acts of terrorism, fire, explosion, extraordinary weather
events, flood, restraint by court order or public authority, or other causes beyond the Parties'

reasonable control.  For purposes of this Agreement, the Parties agree that force majeure does not extend to intentional or negligent failure by Nutrien Ag Solutions or any other party to comply with standard conditions of the General Permit, tortious conduct by an employee of Nutrien Ag Solutions, or any other event that is not beyond the reasonable control of the Parties.

13. **Dispute Resolution Procedures**.  If a dispute under this Agreement arises, or the parties believe that a breach of this Agreement has occurred, the Parties shall schedule a meet and confer within ten (10) business days of receiving written notification from the other Party of a request for a meeting to determine whether a violation of this Agreement has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If the parties fail to meet and confer or the meet and confer does not resolve the issue, after at least seven (7) business days have passed after the meet and confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including bringing a motion before the United States District Court for the  Eastern District of California for the limited purpose of enforcing the terms of this Agreement.  The Parties shall be entitled to seek fees and costs incurred in any such action pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provisions.

14. **Notices.**  All notices, consents, approvals, requests, demands and other communications (collectively, "Notices") which the Parties are required or desire to serve upon or deliver to the other Party shall be in writing and shall be given by nationally recognized overnight courier, by certified United States mail, return receipt requested, postage prepaid, addressed as set forth below, or by electronic mail addressed as set forth below:

**If to EDEN:**

Adam Brumm
Central Valley EDEN Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616

Telephone:  (800) 545-7215
Email:  adam@edendefenders.org, legal@edendefenders.org

**If to Nutrien Ag Solutions:**

Facility Manager
Nutrien Ag Solutions
1905 North Broadway Avenue
Stockton, CA  95205

Courtesy copy to:

Legal Department
Nutrien Ag Solutions
3005 Rocky Mountain Ave
Loveland, CO, 80538


and

Tiffany Hedgpeth
Edgcomb Law Group, LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA  90071
Telephone:  818-861-7618
Email:  thedgpeth@edgcomb-law.com


The foregoing addresses may be changed by Notices given in accordance with this Section. Any Notices sent by mail shall be deemed received two (2) calendar days after the date of mailing. Any Notices sent by electronic mail shall be deemed received upon electronic transmission thereof, provided sender does not receive electronic notice of non-delivery. Any Notices sent by overnight courier service shall be deemed received on the day of actual delivery as shown by the confirmation of delivery by the messenger or courier service.  If the date of receipt of any Notices to be given hereunder falls on a weekend or legal holiday, then such date of receipt shall automatically be deemed extended to the next business day immediately following such weekend or holiday for purposes of calculating time periods commencing upon the date of service.

15. **Attorney Fees**.  Other than the payment to EDEN under <u>Sections 6 and 8</u>, each party shall bear its own <u>past</u> attorney fees and costs relating to the negotiation, subject matter, and execution of this Agreement.  For the purposes of this Agreement, attorney fees are in the past if the attorneys' performance of services pre-date the execution of this Agreement or are performed on the same date as the execution of this Agreement.

After the execution of this Agreement, in any future dispute between the parties for which a lawsuit is filed in a court of competent jurisdiction; the prevailing party to the lawsuit shall

have the right to collect from the other party its reasonable attorney fees and costs, as well as necessary expenditures.

16. **Parties' Acknowledgment of Terms.**  Each Party hereby represents that it has carefully and fully read and reviewed this Agreement and that it has had an opportunity to consult with its respective counsel, and hereby represents that the contents of this Agreement are understood and accepted.

17. **Interpretation and Applicable Law**.  The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning, except as to those terms defined in the General Permit, the Clean Water Act, or specifically herein.  This Agreement shall be construed and interpreted in accordance with the laws of the State of California, without regard to principles of conflicts of law.

18. **Jurisdiction**.  For the purposes of this Agreement, the Parties stipulate that the United States District Court of California, Eastern District of California, has jurisdiction over the Parties and subject matter of this Agreement.  The Parties stipulate that venue is appropriate in the Eastern District of California, and that Nutrien Ag Solutions will not raise in the future as part of enforcement of this Agreement whether EDEN has standing to bring the Complaint or any subsequent action or motion pursuant to the Dispute Resolution procedures herein.

19. **Assignment**.  Subject only to the express restrictions contained in this Agreement, all the rights, duties and obligations contained in this Agreement shall inure to the benefit or detriment of and be binding upon the Parties and their successors and assigns.

20. **Counterparts.**  This Agreement may be executed in one or more identical counterparts, all of which together shall constitute one original agreement.  Electronic, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Agreement.

21. **Headings**.  The headings used in this Agreement are for convenience of reference and shall not be used to define any provision.

22. **Entire Agreement In Writing**.  This is an integrated agreement.  This Agreement constitutes the entire agreement between the Parties hereto with respect to the subject matter set forth herein and supersedes all previous or contemporaneous negotiations, commitments (oral or written), and writings with respect to the subject matter set forth herein.

23. **Modification or Amendment**.  This Agreement and each of its provisions may be modified or amended only by express written agreement executed by all Parties to this Agreement.

24. **Knowing and Intelligent Agreement.**  This Agreement is given voluntarily, free of undue influence, coercion, duress, menace, or fraud of any kind.  Except as otherwise expressly set forth in this Agreement, no Party, nor any person (including any officer, agent, employee, representative, or attorney of or for any Party), has made any statement or representation to

any other Party regarding any fact relied upon in entering this Agreement, and no Party is relying upon any statement, representation, or promise of any other Party, nor of any person (including any officer, agent, employee, representative, or attorney of or for any Party), in executing this Agreement or in making the settlement provided herein, except as expressly stated in this Agreement.

25. **Severability.** If any term of this Agreement is to any extent illegal, otherwise invalid, or incapable of being enforced, such term shall be excluded to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

26. **Negotiated Agreement**. The Parties acknowledge they have negotiated this Agreement and agree that the terms shall not be construed against the Party preparing it, but instead shall be construed as if the Parties jointly prepared this Agreement. Any uncertainty or ambiguity shall not be interpreted against any one Party.

27. **Authority.**  Each of the persons signing this Agreement on behalf of a Party represents and warrants that he or she has actual authority and capacity to execute this Agreement on behalf of the entity and to bind it to all the terms of this Agreement.

28. **Signatures**.  The Parties' signatures to this Agreement transmitted by facsimile or electronic mail transmission shall be deemed binding.

IN WITNESS, WHEREOF, the undersigned have caused this Agreement to be executed by their duly authorized representatives.


CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC


By: _____ Dated: _____    10/18/2023

    Adam Brumm
    General Inhouse Counsel


NUTRIEN AG SOLUTIONS, INC.

By: _____ Dated: **10-17-23**

 Nathan Phillip Packer
 Region Manager, West Region

APPROVED AS TO FORM:


LAW OFFICE OF EDWARD E. YATES


By:_____          Dated:_____
      Edward E. Yates
      Attorney for Plaintiff


EDGCOMB LAW GROUP, LLP


By: _____          Dated:__10/18/2023___
      Tiffany Hedgpeth
      Attorneys for Nutrien Ag Solutions

October 9, 2023
Settlement Agreement
Page 20 of 20

APPROVED AS TO FORM:


LAW OFFICE OF EDWARD E. YATES


By:_____        Dated:__10-18-2023_____
        Edward E. Yates
        Attorney for Plaintiff


EDGCOMB LAW GROUP, LLP


By: _____        Dated:_____
        Tiffany Hedgpeth
        Attorneys for Nutrien Ag Solutions

# EXHIBIT A



*Central Valley* **Eden Environmental Defenders**

August 4, 2022

<u>Via US Mail, Certified and Email</u>

Facility Manager
Nutrien Ag Solutions
1905 North Broadway Avenue
Stockton, CA 95205

Chris Steele
Safety Health and Environmental Manager
Nutrien Ag Solutions, Inc.
P.O. Box 727
Corcoran, CA 93212

<u>Via US Mail</u>

C T Corporation System
Agent for Nutrien Ag Solutions, Inc.
330 North Brand Boulevard, Suite 700
Glendale, CA  91203

Jeff Tarsi
Nutrien
3005 Rocky Mountain Avenue
Loveland, CO  80538

**Re:     60-Day Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Nutrien Ag
Solutions, Inc., Crop Production Services, Inc., dba Nutrien Ag Solutions, and Nutrien Ltd:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC
("EDEN") to give legal notice that EDEN intends to file a civil action against Nutrien Ag
Solutions, Inc. and/or Crop Production Services, Inc. and Nutrien Ltd. ("Discharger" or "Nutrien
Ag Solutions") and its corporate officers and other legally responsible parties for violations of

---

1520 E. Covell Blvd #B5                    Telephone:  (800) 545-7215
Davis, CA  95616                           Email:  admin@edendefenders.org

the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Nutrien Ag Solutions facility located at 1905 North Broadway Avenue in Stockton, California ("the Facility" or "the site").

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below.  EDEN has members throughout California.  Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Nutrien Ag Solutions, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Nutrien Ag Solutions to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Nutrien Ag Solutions under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.       THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board

("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-XXXX-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that Nutrien Ag Solutions has to date failed to submit a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Nutrien Ag Solutions has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.     **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Nutrien Ag Solutions' permanent facility address of 1905 North Broadway Avenue in Stockton, California.

Nutrien Ag Solutions is a facility that distributes and mixes fertilizers, pesticides and fungicides.  Facility operations fall under Standard Industrial Classification Codes (SIC) 2873 – Nitrogenous fertilizers, 2874 – Phosphatic fertilizers, 2875 - Fertilizer, mixing only, and 2879 – Pesticides and agricultural chemicals, not elsewhere classified.  Nutrien Ag Solutions' SIC Codes and facility operations require it to apply for coverage under the General Permit, pursuant to Attachment A of the General Permit.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC codes of 2873, 2874, 2875 and 2879, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids, and various types of oil and grease, as well as iron, nitrates and nitrites (N+N), lead, zinc, phosphorus, ammonia, copper, sulfur, pyrethroids, dissolved oxygen (BOD, COD), chlorpyrifos and diazinon.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   The Affected Receiving Waters

The Facility discharges directly into Stockton Diverting Canal, a tributary of the San Joaquin River ("Receiving Waters").  The San Joaquin River is impaired for Chlorpyrifos, Diazinon, Dissolved Oxygen, E Coli and Enterococcus, and Mercury.

The San Joaquin River is a water of the United States.  The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants.  Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.   VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.   *Failure to Apply For NPDES Coverage*

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

Nutrien Ag Solutions' primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage.  Thus, the Facility was required to apply for coverage under the Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to California Secretary of State records, Nutrien Ag Solutions commenced its operations at the site on or before January 1, 1983, but has failed to date to apply for coverage under the General Permit.

### B.  *Failure to Develop and Implement a SWPPP and Site Map*

Nutrien Ag Solutions has also failed to develop and implement either a Storm Water Pollution Prevention Plan ("SWPPP") or Site Map for the Facility.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### C.  *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.  Failure to Conduct Visual Observations

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants.  Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

Eden alleges that Nutrien Ag Solutions has failed to conduct required visual observations since August 15, 2017.

 2. <u>Failure to Collect and Analyze Storm Water Samples</u>

  In addition, EDEN alleges that Nutrien Ag Solutions has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

  Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

  As of the date of this Notice, Nutrien Ag Solutions has failed to upload into the SMARTS database system any facility storm water run-off sample analyses.

  **D.** ***Failure to File Annual Reports***

  Nutrien Ag Solutions has failed to comply with Section XVI.A of the General Permit, which provides as follows:  "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

  To date, Nutrien Ag Solutions has failed to file Annual Reports for the reporting years 2017-2018, 2018-2019, 2019-2020, 2020-21 and 2021-22.

  **E.** ***Deficient BMP Implementation***

  Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

  EDEN alleges that Nutrien Ag Solutions has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

  Nutrien Ag Solutions' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

### F.   *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### G.   *Failure to Comply with the Mandates of the Regional Water Board*

Pursuant to Section XIX.B of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

As of the date of this Notice, Nutrien Ag Solutions has failed to comply with mandates of the Regional Water Board that it apply for General Permit coverage.

### H.   *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the

General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

As of the date of this Notice, Nutrien Ag Solutions has failed to establish and train a Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Nutrien Ag Solutions may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.   THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Nutrien Ag Solutions, Inc., Crop Production Services, Inc. and Nutrien, Ltd, as well as their corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.   THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is August 15, 2017, to the date of this Notice. EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice. Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.   CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.

## VII.   RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit

requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $56,460.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Nutrien Ag Solutions' counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Nutrien Ag Solutions may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Nutrien Ag Solutions wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Nutrien Ag Solutions or its counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel. Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eileen Sobeck, State Water Resources Control Board, eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov

# EXHIBIT B

**TABLE 2:** Parameter NAL Values, Test Methods, and Reporting Units

| PARAMETER | TEST METHOD | REPORTING UNITS | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|---|
| pH* | See Section XI.C.2 | pH units | N/A | Less than 6.0 Greater than 9.0 |
| Suspended Solids (TSS)*, Total | SM 2540-D | mg/L | 100 | 400 |
| Oil & Grease (O&G)*, Total | EPA 1664A | mg/L | 15 | 25 |
| Zinc, Total (H) | EPA 200.8 | mg/L | 0.26** | |
| Copper, Total (H) | EPA 200.8 | mg/L | 0.0332** | |
| Cyanide, Total | SM 4500–CN C, D, or E | mg/L | 0.022 | |
| Lead, Total (H) | EPA 200.8 | mg/L | 0.262** | |
| Chemical Oxygen Demand (COD) | SM 5220C | mg/L | 120 | |
| Aluminum, Total | EPA 200.8 | mg/L | 0.75 | |
| Iron, Total | EPA 200.7 | mg/L | 1.0 | |
| Nitrate + Nitrite Nitrogen | SM 4500-NO3- E | mg/L as N | 0.68 | |
| Total Phosphorus | SM 4500-P B+E | mg/L as P | 2.0 | |
| Ammonia (as N) | SM 4500-NH3 B+ C or E | mg/L | 2.14 | |
| Magnesium, total | EPA 200.7 | mg/L | 0.064 | |
| Arsenic, Total (c) | EPA 200.8 | mg/L | 0.15 | |
| Cadmium, Total (H) | EPA 200.8 | mg/L | 0.0053** | |
| Nickel, Total (H) | EPA 200.8 | mg/l | 1.02** | |
| Mercury, Total | EPA 245.1 | mg/L | 0.0014 | |
| Selenium, Total | EPA 200.8 | mg/L | 0.005 | |
| Silver, Total (H) | EPA 200.8 | mg/L | 0.0183** | |
| Biochemical Oxygen Demand (BOD) | SM 5210B | mg/L | 30 | |

SM – Standard Methods for the Examination of Water and Wastewater, 18th edition
EPA – U.S. EPA test methods
(H) – Hardness dependent
* Minimum parameters required by this General Permit
**The NAL is the highest value used by U.S. EPA based on their hardness table in the 2008 MSGP.